The next case for argument is 22-1630 Brumfield v. IBG Thank you, Your Honor, and may it please the Court, I'd like to begin with a statement that my friend Mr. Gannon made in IBG-1. In response to the question from this Court, is the technological feature here the static price index? And I quote, it's the combination of static plus single action plus relative movement of the indicators. It's the combination of elements that provide the solution. It's the combination of elements that provide improved accuracy, visualization, which this Court found in eSpeed and in CQG, and improvements in speed. It's the combination. You'll find that at minute 38 of the oral argument recording in that case. You no longer have the combination. You no longer have a technological solution. And this is very clear from the record here, because at claim construction, at TT's own behest, they said these claims are not limited to static price axes. You'll find this conceded at page 38 of their opening brief, at page 28 of their opening brief. I think what I'm hearing you saying is that the CBM threshold, jurisdictional if you want to call it, ruling was based on language that had not yet been construed. It has now been construed. It has, therefore, a different meaning. That's correct as to the 996, Your Honor. It's also, of course, a non-precedential decision. Put that aside. Put that aside. And to respond to the very first question that you asked, Your Honor, about the difference between Section 18A of the AIA and Section 101 of the Patent Act, there is certainly no indication that Congress, in adopting Section 18A and establishing the processes before the Patent Office, intended to supplant or collapse the Section 101 inquiry into this more abbreviated analysis. As you yourself noted, the statute refers to a claim for a technological invention. It doesn't even say solution. Can you go back to what you were talking about before? You said in one of the two patents, the static resolves this. Correct, Your Honor. What about the other one? The 996 is the only one that refers to a static. I would encourage you not to let them wiggle away from their concessions in their briefs, page 28 and 38, and in the district court at claim construction as to the 996. We're just dealing with claims that go to non-static stuff. But the 411, it says nothing whatsoever about holding a price. It's simply about movement and repositioning. You look at the terms, receive, display, select. This is quintessentially what this Court called in Zillow, do it on a computer patenting. All you've got there is the display of market information and receiving information. It's even weaker. The 996 would be their stronger claim, but they have conceded that it's not about static price axes. So I would also direct the Court to this Court's precedential discussion in e-speed. You'll find this at page 1354, and I quote, Allowing the price axis to automatically change positions would defy the invention's goal to ensure fast and accurate execution of trades. Cite to the same specification. The invention would present the same problem as the prior inventions if the price axis moved automatically even in rare instances. The static display of prices could automatically recenter just as the trader was getting ready to execute a trade, causing the trader to miss the intended price. End quote. The Court goes on to say, after noting that the accused product there only automatically recentered once or twice per trading day, they said, this is at page 1356, The difference between a price axis that moves only in response to the trader's instruction and a price axis that adjusts itself without prompting is not subtle. Rather, as discussed above, this difference lies at the heart of the advantages of the patented invention over the prior art. In IBG 2, at pages 1091 and 1095, this Court said, Claims do not solve the missing the price problem if they don't specify what happens immediately after the price changes to keep the prices from moving on the user's screen. You will search these patents in vain for anything that does that. So even assuming you've got reasoning that you needed to abide by, it doesn't apply to this case. But, of course, it's non-precedential, and you've issued several precedential decisions, both in the specific context of electronic trading patents, and more generally that say these sorts of patents are directed to abstract ideas and they have no inventive concepts. If I may then turn to the extraterritoriality issue, Judge Hughes, your comment that this would blow up the presumption against extraterritorial is exactly right. The District Court was clearly correct that Western GECO did not overrule power integrations. Remember what was before the Court in Western GECO, 271F2, a statute at the intersection... Are you saying that Western GECO doesn't apply to 271A at all? I don't believe it does, Your Honor, because Section 271... You don't need to win that argument to win this case, though, do you? Well... I mean, 271A, to the extent what we're looking at in Western GECO, you know, you argue your case any way you want to, but if that's your point, that seems like a loser. Western GECO says you look at the act of infringement, and if it's domestic, you look at the reasonably foreseeable damages. Well, 271A is all domestic infringement, and so it turns into what was the act of infringement and what's foreseeable, not whether power integration remains good law for all purposes. And that's why you have to remember that it's a necessary but not sufficient condition to conclude there's some domestic conduct. As this Court said in Power Integrations, and as the Supreme Court said in Abitron, that the presumption against extraterritoriality would be a craven watchdog if you could just point to some domestic conduct and avoid the whole problem. This is like a Jedi mind trick on their part. Oh, look, it's all about domestic conduct. Therefore, you get foreign damages. That's not how the Supreme Court has treated the presumption against extraterritoriality. I guess underscore the point. I'm genuinely unsure what the argument for this case about whether the excluded theory has to do with extraterritoriality at all. Sure, and so let me... The logic of Western GECO seems absolutely clear. Identify the act that's infringing. There might have been a little bit of doubt about it in F2, but there's no doubt at all about it in 271A. And now you get approximately caused damages, as long as that act is actually infringing. I don't see why... I mean, just tell me, where does extraterritoriality come in at that point? Well, two things, Your Honor. First of all, remember that the court in Western GECO was faced with whether to apply the presumption against extraterritoriality, and it says, we're not going to go there. We're going to rule more narrowly, because this statute is focused on the act of exporting. And note, very clearly in Justice Thomas' opinion, he says you have to look at both Section 284 and the underlying infringement statute. A fortiori, 271A. Okay, but if you take it out of the context and you say all you have to do to get foreign damages is to conclude that there's domestic conduct, when the statute under which you get infringement has an express territorial limitation, you blow up the statute. Section 271A could not be clearer. Neither could Section 154A1. You've got a right to exclude in the United States. You think 271A is clear that a domestic act, completely domestic act, that, let's say, for purposes of this hypothetical, indisputably causes some sort of foreign harm, that 271A says you don't get damages for that? I think that's correct, Your Honor. Okay, put that argument aside. What else do you have? So, if you, first of all, you don't even need to reach this issue because of what was presented to the jury here. Ms. Lawton. I mean, as I think you understand, it is along some lines like that, that at least I was trying to explore and I think we were all trying to explore, the making in the relevant paragraphs of Ms. Lawton's submission on this sounds like it's not even a 271 act because, a covered act because it is merely the design. The design would not be enough, but I'm interested in the different view of what is being said there. Namely, let's suppose she was saying the making of a specific copy, one copy sitting in Connecticut, made in Connecticut, sitting in Connecticut, has an effect on something abroad, the traders in Asia or something. What's the objection to that theory? The objection is that the foreign effect is use and use is an independent category of infringement under section 271A and it is equally subject to the territorial limitation. Let me tell you what she presented. Her first theory was that foreign... I'm sorry, your damages theory was based on measuring use. TT's damages... Also use. No, it was not. It was based on a slice of a sale. The sale being a monthly license to use. User months, your honor. That's right. $50 per user month. That's a slice of the sale. They were not metering the use. You were metering the use. Walton's theory was not. I disagree, but I would note, your honor, that all of her theories, all four, including the domestic one, they all led to the same damage number. The only question was, how broad of a base do you get? She had two ways that she was allowed to present, that the court allowed. We don't think this was right, but I'll explain in a minute why it's a bridge too far to go even further. Theory number one, when you make a copy, if the foreign buyer downloads it from a U.S. server, then that's making a copy within the United States. The jury rejected that. That was permitted. They were allowed to present it, but the jury rejected it. Judge Kendall explains in her post-trial opinion that damages were based not on a lump sum, but on a royalty rate, and that they chose the $6.6 million figure, choosing United States users. They rejected that theory. They rejected the other theory as well. This is one of the things I guess I didn't understand. I'm going to ask it first in a form that needs modification. On what basis did the jury reject it? Obviously, we don't know, but you can maybe infer from, what did you argue? What evidence was there against the adoption of that theory? It's basic math, Your Honor. We argued for, we said, look, we think it should be a $0.05 royalty or a $0.02 royalty. At most a $0.10 royalty. I'm sorry, measured $0.05 per what? Per trade. Okay. Per trade. Yeah, and we said $0.10 is the most it should be. I'm sorry, and on that theory, was Lawton using a per trade measure or again a per monthly user measure? She was arguing for a $50 per month based on users. I view that as a user analogy, but what the jury decided was you get $6,610,985. That is $0.10 times the U.S. user base. The jury, they had basically speculative evidence that foreign users were adopting, were copying the software by downloading it from a U.S. server. So the jury didn't buy that. They said you get your $6,010 times the U.S. user base. They had a separate. So the jury might have rejected it on the idea that there just wasn't domestic copying. Okay, but that. Which is why. Which is not inconsistent as a logical matter with Lawton theory number four. And which is why they rejected the factual predicate for Lawton's theory. Because her factual predicate was the incidental result, the foreseeable result of the domestic activity is foreign use. Now, I say that that's an independent category of infringement that's also subject to the territorial limitation. But the jury said, we don't buy that the foreign users didn't go to foreign servers. Now, she had one other theory, and that was the theory that they entered into a sales agreement by entering a Custer agreement with IBGLLC, which is a U.S. entity. Jury rejected that as well. And you'll see at pages A26, appendix 26, and appendix 42 and note 4, the district court specifically explains how this is what the jury did. The math is precise. But she explains this is what the jury did. So if you don't, you can hold either that Western GECO did not, and power integrations are not clearly irreconcilable. We think that that would flip the presumption against extraterritorial on its head and ignore the territorial limitation. Or you may hold that there's harmless error because they were allowed to present their foreign theories to the jury. If there are further questions, I'm happy to answer them. Thank you, Your Honor. Well, we saw you way beyond, so I'll give you a few minutes to rebuttal. It's dinner time or lunch time. I can't tell. Thank you. Three minutes. There's a chart on page 15 of the red brief. Just to clarify Judge Taranto's point, which I may be misunderstanding completely. But the other side presented the domestic sales, and then forget the other $50 per month. Look at the $0.10 per unit. And they did a worldwide calculation. Would that include the damages that you're... Would those include the products and the uses that you're alleging overseas under this Western GECO theory that was rejected by the district court? So, Judge Taranto is right that I.B.'s theory was $0.10 per trade. Right. T.T.'s theory is $50 per month. Okay. Okay. But I'm just saying... And they were allowed... The jury was allowed to consider two theories for foreign sales or foreign uses, and they presented the number of $19.5 million for worldwide sales. Are the number per unit... I know you disagree with that, but are the units there... Is that overlapping with what you're saying should be damages under the Western GECO theory, or is this the same thing? I think it's different because this theory, I.B.'s theory, was based on that the jury agreeing with T.T. that every time they selected a book trader, a copy was made in the U.S. Every copy was made in the U.S. and then distributed to all of these worldwide users. It wasn't... So, in other words, Ms. Lawton never testified about foreign use, foreign users using the software. She testified about, and our expert, our technical expert, talked about everybody all over the world having a copy, a copy is made in the U.S. That apparently was rejected by the jury. And so the theory that was excluded was the foreseeability theory, the making in the U.S. under 271A, and that T.T. is entitled to all damages that are foreseeable from that. What were the acts that were foreseeable? So, you mentioned, Judge Scarano, the issue of designing. It's not... No, no, no, no, no. I'm trying to ask, I think, the same question. I understand, Judge Post. You said that the theory, fourth theory of Lawton, is something or other that caused harm was foreseeable. What is the something or other that was the harm, not that caused it? I want to put that aside, whether it's the design or the single copy in Connecticut. Okay. How did the harm abroad arise? How did the harm... Right. How were the activities... A causes harm, B. That's right. What's B? So that's the subject of Ms. Lawton's report. The harm that resulted from I.B. making BookTrader under 271A, the harm that resulted from that was that their worldwide customers were getting access to the infringing product. That's the foreseeable... That is the harm that was caused by the act of making under 271A. How did that harm you? How did it harm... You, your client. Our client? You're the plaintiff. Because our client has a patent in the U.S. that I.B. was infringing based on their making of BookTrader in the United States. And so T.T.'s theory, again, the whole theory that got excluded, and again, Ms. Lawton is very clear. She talks about... I'm really... This has been very imprecise about what the harm is. You're calculating the harm based upon what? A flat monthly user rate abroad? So the harm is people using this abroad? The harm is... The harm is you would have been able to sell this, your product, or even if you're not making a product, is that this product being used abroad is infringing. It's not infringing over... The act occurred here. The infringing act occurred here. So how did that act of making one copy here, what's the harm directly relatable to your client? The harm is that T.T. has licenses where we license the product for $50 per screen. And so... You're being deprived of foreign license fees because of the infringement here. T.T.'s license... Yes, T.T.'s license fee, $50 per screen, is what T.T. was the testimony from Ms. Lawton at trial. That's the fee to be able to use this particular tool, $50 per screen. Okay. So... Just one thing on the 101 issue. One thing because we're way out of time. Okay, so what I heard a lot from my friend here is a lot of the same things that we heard in IBG-1 that was argued. We brought it up. It was brought up at the hearing, whether or not the 411 and the 996, because it has this different claim scope, whether it's still solving the problem. It was addressed in the briefs. It was addressed at oral argument. It was addressed in the petition for rehearing on BOT and on our response. It's the same issue. And, again, this court found that it's no different than the 132 and 304. All four are solving a technical problem with a technical solution. And if you don't have any further questions. Thank you. Thank you. We thank both sides and the cases submitted.